**THOMAS P. SMITH, JR.**
**CO-ACTING REGIONAL DIRECTOR**
**Celeste A. Chase**
**Richard Hong**
**Derek M. Schoenmann**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street, Suite 20-100**
**New York, New York 10004-2616**
**(212) 336-0956 (Hong)**
**hongr@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>        **Plaintiff,**<br><br>   -against-<br><br>**CHARLES RUSTIN HOLZER,**<br><br>        **Defendant.** | **COMPLAINT**<br><br>**22 Civ. _____ (    )** |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint

against Defendant Charles Rustin Holzer ("Holzer"), alleges as follows:

**SUMMARY**

1.   This is an insider trading case alleging that Holzer illegally traded stock and

options of NYSE-listed Dun & Bradstreet Corporation ("DNB").

2.   On August 8, 2018, DNB announced (the "Announcement") that it had agreed to

be acquired by a private investor group (the "Investor Group") in an all-cash transaction for $145

per share (the "Acquisition"), which represented a 15% premium to its then-current market price.

3.   About a week before the Announcement, Holzer learned about the Acquisition

from an investment adviser that was part of the Investor Group (the "Adviser") pursuant to a

non-disclosure agreement (the "NDA") executed by or at the direction of Holzer.  The NDA required Holzer to keep confidential all information about the Acquisition and to use it "solely for the purpose of evaluating" whether to participate in the transaction alongside the Adviser.

4.     Upon execution of the NDA, the Adviser shared with Holzer the name of the Acquisition target (DNB), the $145 per share purchase price, the anticipated date of the public Announcement (on or before August 9, 2018), and other material non-public information ("MNPI"), including a 109-page investment presentation deck (the "Investment Deck") replete with detailed, confidential financial information about DNB and the Acquisition.

5.     Unknown to the Adviser, however, Holzer knowingly or recklessly misappropriated the MNPI he learned and used it to trade DNB options ahead of the Announcement in breach of the NDA.  After the Announcement caused DNB's stock price to rise to match the $145 per share acquisition price, Holzer realized more than $90,000 in profits on his DNB options trades.

6.     In addition to trading on MNPI provided by the Adviser, Holzer, in further violation of the NDA, knowingly or recklessly tipped MNPI about DNB to his cousin and close friend, Trader-1, who traded on that information.  Trader-1 realized $672,000 in profits from that trading.

**VIOLATIONS**

7.     By virtue of the foregoing conduct and as alleged further herein, Holzer has violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8.     Unless Holzer is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions,

and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9.      The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) and 21A [15 U.S.C. §§ 78u(d) and 78t-1].

10.     The Commission seeks a final judgment: (a) permanently enjoining Holzer from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Holzer to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)]; (c) ordering Holzer to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) ordering that Holzer be permanently barred from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 21, 21A, and 27 of the Exchange Act [15 U.S.C. §§ 78u, 78u-1, and 78aa].

12.     Holzer, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13.     Venue in this District is proper under Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts, practices, transactions, and courses of business constituting

the violations alleged in this Complaint occurred in the Southern District of New York.  At all

times relevant to this action, the securities Holzer traded illegally were traded on the New York

Stock Exchange ("NYSE"), which is located in this District.  In addition, Holzer's firm, Worth

Capital Holdings LLC (together with various affiliated investment vehicles, "Worth Capital"),

which is headquartered in this District, received MNPI from the Adviser (also headquartered in

this District) pursuant to an NDA executed in this District.  And Holzer's unlawful disclosure of

MNPI to Trader-1 occurred in part during an in-person meeting in this District.

## DEFENDANT

14.     **Holzer**, age 53, of Wellington, Florida, is the Managing Member of Worth

Capital, a real estate-focused family office owned by the Holzer family and headquartered in

New York, New York.  From 2001 to 2005, Holzer was employed by a registered broker-dealer,

where he held series 3, 7, and 63 licenses.  Holzer does not currently hold any securities licenses

and is not currently registered with the Commission in any capacity.  Since 2020, Holzer has

served on the board of directors of a publicly-traded online food delivery company.

## RELEVANT PERSONS AND ENTITIES

15.     **DNB** is a Delaware corporation headquartered in Jacksonville, Florida that

provides commercial data, analytics, and trade credit and risk management services.  During the

relevant period, DNB's common stock was registered with the Commission pursuant to Section

12(b) of the Exchange Act and traded on the NYSE.  Prior to its Acquisition by the Investor

Group, DNB filed periodic reports, including Forms 10-K and 10-Q, with the Commission

pursuant to Section 13(a) of the Exchange Act and related rules thereunder.  DNB went public

again in July 2020 and is once again listed on the NYSE.

16.     The **Adviser** is a registered investment advisory firm headquartered in New York,

New York.  The Adviser invests in alternative assets classes, including private equity, real estate, distressed credit, and hedge funds.

17.     **Trader-1**, an individual residing in Palm Beach, Florida, is Holzer's cousin and close friend.  Trader-1 is the founder and managing member of an investment firm that was previously registered with the Commission as an investment adviser, but withdrew its registration in 2016, after which it continued to operate as a family office.  Trader-1 does not currently hold any securities licenses and is not currently registered with the Commission in any capacity.  Although Trader-1 is not affiliated with Worth Capital, Trader-1's investment firm shares office space in New York, New York with Worth Capital.  Holzer serves as trustee of several trusts held by or for the benefit of Trader-1's family.

## BACKGROUND ON OPTIONS

18.     A stock option, commonly referred to as an "option," gives its purchaser-holder the option to buy or sell shares of an underlying stock at a specified price (the "strike price") prior to the expiration date.  Options are generally sold in a "contract," which gives the option holder the opportunity to buy or sell 100 shares of an underlying stock.

19.     A "call" option contract gives its purchaser-holder the right, but not the obligation, to purchase 100 shares of an underlying stock at a certain share price within a specific time period.  Generally, the buyer of a call option anticipates that the price of the underlying security will increase during a specified amount of time.

20.     A "put" option contract gives its purchaser-holder the right, but not the obligation, to sell 100 shares of the underlying stock at the strike price on or before the expiration date, in exchange for paying a premium up front.  Generally, the buyer of a put option expects that the price of the underlying stock will decrease on or before the expiration date, allowing the buyer to

profit by acquiring the stock at market and selling it at the higher strike price.  Conversely, the seller (a/k/a the "writer") of a put option expects that the price of the underlying stock will rise or remain above the strike price until the expiration date, at which time the put option will expire worthless and the seller (writer) will realize a profit simply by keeping the premium proceeds.

**FACTS**

**I.      Holzer Obtained MNPI about the Acquisition from the Adviser Pursuant to an NDA.**

21.     On or about May 19, 2018, a member of the Investor Group executed a confidentiality agreement with DNB's board of directors to engage in due diligence in connection with a potential business transaction.

22.     On July 9, 2018, the Investor Group made a non-binding offer to take DNB private at a price of $145 per share.  Following continued negotiations, DNB management presented the Investor Group with a draft merger agreement on July 26, 2018.

23.     On July 27, 2018, a managing partner of the Adviser, which was a member of the Investor Group, called Holzer to discuss an investment opportunity initially on a "no names" basis, pending execution of a non-disclosure agreement.  Holzer had been a client of the Adviser and Worth Capital had invested in prior real estate and private equity deals through the Adviser.

24.     Holzer expressed interest, and shortly after the call, the Adviser sent Holzer a draft of the NDA addressed to Holzer's family office, Worth Capital.  The NDA required Worth Capital and its "Representatives" (defined to include all officers, employees and affiliates) to keep confidential any information provided by the Adviser and to use such information "solely for the purpose of evaluating financing alternatives for the benefit of [the unnamed acquisition target]," which it described as a "leading publicly listed commercial data and analytics company."  The NDA also prohibited disclosure of the fact "that discussions or negotiations are

taking place concerning a possible transaction with" the acquisition target.

25.     On July 30, 2018, Holzer signed, or directed another Worth Capital associate to sign, the NDA on behalf of Worth Capital.  This same Worth Capital associate then emailed the signed NDA back to the Adviser at Holzer's direction, copying Holzer.

26.     Approximately half an hour later, the Adviser sent Holzer the 109-page Investment Deck.  The Investment Deck was labeled "Strictly Private and Confidential," and included a statement that it was prepared on the basis of "~10 weeks of access to confidential company information" obtained by the Investor Group and its advisors pursuant to various non-disclosure agreements.

27.     The Investment Deck identified the target of the proposed acquisition as DNB and the acquisition price as $145 per share (a 15.1% premium to DNB's last closing price), and noted the parties' intent to sign and announce a transaction before DNB's earnings call scheduled for 8:00AM EST on August 9, 2018, all of which was non-public information.  A reasonable investor would have viewed this information as material to a decision whether to buy or sell DNB securities.

28.     The Investment Deck also included a detailed analysis of DNB's current and projected performance and other non-public information collected during the due diligence process.  Among other things, the Investment Deck: (i) identified and analyzed "robust value creation opportunities" justifying the proposed ~15% purchase premium; (ii) identified potential cost-savings opportunities totaling up to $350 million; and (iii) noted that DNB was "significantly undermanaged" based on an analysis of the company's current management team, as well as its organizational and reporting structure, systems, incentive programs, culture, and performance tracking methodologies.  A reasonable investor would have viewed the foregoing

information contained in the Investment Deck as material to a decision whether to buy or sell DNB securities.

29.     Over the next week, Holzer had numerous calls and email exchanges with representatives of the Adviser and other members of the Investor Group about the deal.  Among other things, Holzer was provided with memoranda containing additional non-public financial information about DNB obtained via the due diligence process.  Holzer also received regular updates from the Adviser on the progress of the final merger agreement and the timing of the Announcement.  A reasonable investor would have viewed the foregoing information as material to a decision whether to buy or sell DNB securities.

30.     On or about August 5, 2018, Holzer made a verbal commitment to the Adviser that Worth Capital would contribute $5 million to the DNB Acquisition.  Following the Announcement, and after executing a subscription agreement with the Adviser for $5 million, Holzer unilaterally reduced Worth Capital's commitment to $1.5 million and brought in another investor to assume another $1.5 million, leaving the Adviser to make up the $2 million shortfall.

## II.     Holzer Traded in DNB Options Ahead of the Announcement.

31.     On August 7, 2018, the day before the Announcement, Holzer bought 50 DNB Feb. 15, 2019 calls (with a $130 per share strike price), and sold 50 DNB Feb. 15, 2019 puts (with a $115 per share strike price), in a brokerage account in Holzer's name.  DNB stock closed at $125.82 per share on August 7.

32.     On the morning of August 8, 2018, Holzer bought another 50 DNB Feb. 15, 2019 calls (with a $135 per share strike price) and sold another 50 DNB Feb. 15, 2019 puts (with a $115 per share strike price) in the same brokerage account.  DNB stock closed at $122.80 per share on August 8.

33.     Holzer's total net payment (including commissions) for the DNB puts and calls he traded on August 7 and August 8, 2018, was $28,897.

34.     DNB's board of directors approved the Acquisition on August 8, 2018, and the Acquisition was announced to the public later that day after the markets closed.  The next day, DNB stock closed at 142.21, up 16% from its closing price on August 8.

35.     After the Announcement, Holzer held his 100 DNB call options and sold them on the expiration date (February 15, 2019) for $125,000.  The DNB puts he had written expired worthless that same day.  Holzer's actual net profit on those trades was $96,091 (a 333% return).

36.     Holzer did not disclose to the Adviser that he was going to trade or had traded in DNB stock or options ahead of the Announcement.  Holzer had not traded in DNB stock or options prior to August 7, 2018.

37.     Holzer's DNB options trades on August 7 and August 8, 2018, were made on the basis of MNPI that Holzer knowingly or recklessly misappropriated from the Adviser.  Holzer learned the MNPI pursuant to the NDA, which imposed on Holzer a duty to keep the information confidential and to not trade on the information.  Holzer knew or was reckless in not knowing that he was in possession of MNPI about DNB, and that by trading on that information he was breaching his duty of confidentiality to the Adviser.

**III.     Holzer Tipped MNPI to His Cousin and Close Friend, Trader-1, Who Also Traded Ahead of the Announcement.**

38.     Trader-1 and Holzer routinely discuss trading and investment ideas and strategies. Trader-1 sometimes trades based on high-level trading recommendations from Holzer, which Holzer calls "elevator pitches," without conducting additional research.

39.     On July 30, 2018, less than two hours after Holzer received the Investment Deck from the Adviser disclosing the name of the acquisition target and other MNPI about DNB and

the Acquisition, Holzer met with Trader-1 at the office space shared by Worth Capital and

Trader-1's family office.

40.     During their meeting on July 30, Holzer gave Trader-1 an "elevator pitch" about

DNB.  Holzer advised Trader-1 that he should buy DNB stock, telling Trader-1 that DNB was

undervalued, undermanaged, and had significant cost savings available.  Holzer's

recommendation to Trader-1 to buy DNB stock was based on MNPI and related analysis

contained in the Investment Deck, including, but not limited to, that DNB was about to be

acquired by the Investor Group for $145 per share.

41.     The next morning, July 31, 2018, Trader-1 bought 20,000 shares of DNB through

two brokerage accounts in the name of entities owned and controlled by Trader-1.  Trader-1's

purchases on July 31, 2018 represented approximately 8.6% of the total volume of DNB shares

traded that day.  Trader-1 did not perform independent research before buying DNB stock, and

would not have bought that stock but for Holzer's tip.  Prior to these trades, moreover, Trader-1

had not traded in DNB stock or options.

42.     Trader-1 went on to purchase another 20,000 DNB shares in those same

brokerage accounts between August 1 and August 8, paying a total of $5 million for the 40,000

DNB shares.  Trader-1 would not have made these additional purchases of DNB stock but for

Holzer's recommendation.

43.     Between August 3 and August 7, 2018, while Trader-1 was building his DNB

position, Holzer and Trader-1 had another conversation, this time by phone, in which Holzer

again advised Trader-1 to buy DNB stock because the company was undervalued.  Between the

July 30, 2018 meeting and the subsequent call with Trader-1, Holzer learned additional MNPI

from the Adviser pursuant to the NDA, including additional financial information and analysis

about DNB and the Acquisition, and updates on the progress of the Acquisition negotiations and the timing of the Announcement.

44.     The morning after the Announcement (August 9, 2018), Trader-1 sold his entire 40,000 share stake in DNB, realizing a net profit of $672,000.

45.     Holzer did not disclose to the Adviser or to anyone else that he had discussed DNB with Trader-1 prior to the Announcement.

46.     The information that Holzer communicated to Trader-1 during their meeting on July 30, 2018 and their subsequent telephone conversation several days later – including that DNB was undervalued, undermanaged, and had significant cost savings available – was MNPI that Holzer learned from the Adviser pursuant to the NDA.

47.     Holzer had a duty not to disclose that information, and he knowingly or recklessly breached that duty by communicating the information to Trader-1.  Further, by advising Trader-1 to buy DNB stock on the basis of that information and other MNPI that Holzer learned pursuant to the NDA, Holzer intended that Trader-1 would trade DNB securities.  Those communications constituted gifts of confidential information to Holzer's cousin and close friend, thus benefiting Holzer.

## CLAIM FOR RELIEF
### Violation of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

48.     The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 47.

49.     Holzer, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or

omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

50.     By reason of the foregoing, Holzer, directly or indirectly, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Holzer from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Holzer to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violation pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Holzer to pay civil monetary penalties under Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**IV.**

Permanently prohibiting Holzer from serving as an officer or director of any company

that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that

is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to

Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
         September 30, 2022

*/s/ Thomas P. Smith, Jr.*
THOMAS P. SMITH, JR.
CO-ACTING REGIONAL DIRECTOR
Celeste A. Chase
Richard Hong
Derek M. Schoenmann
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, New York 10004-2616
(212) 336-0956 (Hong)
hongr@sec.gov